## CARY BROS. & HANNON v. MORRISON.

(Circuit Court of Appeals, Eighth Circuit. March 18, 1904.)

No. 1,928.

1. EXPLOSIVES—BLASTING—RIGHT TO USE TO GRADE RAILROAD.

Blasting by the use of gunpowder or dynamite is an appropriate and justifiable mode of removing rock from the right of way of a railroad in order to bring it to grade, and a railroad company or its grading contractors may lawfully employ it, with reasonable care.

2. SAME—THROWING ROCKS UPON NEIGHBORING PROPERTY—WARNING.

While a contractor may lawfully use blasting with gunpowder or dynamite to remove rock in the right of way of a railroad company, he has no right by its use to throw rocks upon persons rightfully occupying or using neighboring property. Such an act is a trespass, and it is his duty to give such persons reasonable warning of coming explosions.

3. SAME—UNHEEDED WARNING—CONTRIBUTORY NEGLIGENCE.

It is the duty of one who is lawfully using property near to that upon which another is legally engaged in blasting, and who is warned of a coming explosion, to use reasonable diligence to escape from danger on account of it; and a failure to exercise such care, which concurs in producing his injury, waives his right of action for the trespass, and constitutes contributory negligence, which is fatal to his action for damages for the injury.

4. CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY—EXCEPTION.

The question whether or not one is guilty of contributory negligence is ordinarily for the jury. It is only when the facts which condition the question are stipulated, or are established by testimony which is free from substantial conflict, and the inference from the facts is so certain that all reasonable men, in the exercise of a fair and impartial judgment, must agree upon it, that the question of contributory negligence may be lawfully withdrawn from the jury.

5. EXPLOSIVES—BLASTING—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

The defendants were lawfully engaged in blasting rock out of the right of way of a railroad company at a point about 150 feet from a river. The decedent was rightfully walking along the bank of the river a short distance below a point opposite the place of blasting, holding the prow of a ferryboat away from the bank with a pole, while the ferryman was walking ahead of him, pulling the boat up the stream, in the customary way, preparatory to poling it across. The decedent had engaged his passage across the river upon the boat. The custom of the defendants was to send men out, shouting "Fire," at short intervals for a period of 12 or 15 minutes before exploding a charge of gunpowder or dynamite, and the charges had been so heavy that rocks had fallen all around the place where the decedent and the ferryboat were, and had broken limbs and stripped foliage from the trees of the forest which intervened between the right of way and the river, and concealed the boatmen from those engaged in blasting, who were not aware of their presence before the explosion. The decedent had worked for the defendants, and knew these facts and this custom. Seven witnesses heard the cry of fire 12 to 15 minutes before the explosion. Three heard it from 2 to 5 minutes before. When the ferryman heard it, he shouted "Don't shoot," and he and the decedent continued to ascend the stream within 200 or 300 feet of the place of blasting. The ferryman heard it again, and answered it again, and they continued up the river. The ferryman heard it a third time, answered again, the signal to explode the blast was given, the charge was fired,

¶ 2. See Explosives, vol. 23, Cent. Dig. §§ 9, 10.

and a rock fell upon the decedent and killed him. The defendant's wit- nesses testified that they did not hear the cry "Don't shoot."

*Held*, the question whether or not the decedent was guilty of contributory negligence was for the jury.

Thayer, Circuit Judge, dissenting.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the Western District of Arkansas.

G. B. Rose (U. M. Rose and W. E. Hemingway, on the brief), for plaintiffs in error.

Ira D. Oglesby (W. E. Atkinson and Geo. O. Patterson, on the brief), for defendant in error.

Before SANBORN, THAYER, and HOOK, Circuit Judges.

SANBORN, Circuit Judge. This writ of error questions the proceedings at the trial of an action for negligence brought by Mrs. T. Jane Morrison, the administratrix of the estate of W. L. Morrison, against Cary Bros. & Hannon, a partnership composed of the defendants below, which resulted in a judgment against the defendants for $6,000. In her complaint the plaintiff alleged that her husband, W. L. Morrison, was killed by a blow from a rock which was carelessly thrown from a blast by the defendants, who were then engaged in grading the Little Rock & Ft. Smith Railroad. The defendants denied that they were guilty of negligence, and alleged that the injury and death of Morrison were caused by his own carelessness, in that he disregarded warnings that the explosion was about to occur, and refused or neglected to seek a less dangerous place. At the close of the trial the court, in effect, charged the jury that Morrison was free from negligence, and that, if they believed that the defendants were guilty of carelessness which caused his injuries and death, the plaintiff was entitled to a verdict. This instruction is challenged, and its consideration necessitates a review of the facts disclosed by the evidence at the trial, which were these: Cary Bros. & Hannon had been engaged at the place where the accident occurred in blasting heavy rocks out of the right of way of the Little Rock & Ft. Smith Railroad Company for about two weeks. At the place where they were at work the right of way ran east and west parallel to, and about 150 feet distant from, a river 1,200 feet wide. The surface of the ground along the right of way was higher than that of the river, and between them was a forest, which, with its foliage, made it impossible to see the river from the surface of the ground along the right of way, although there was testimony that it was visible from a pile of timber and brush some 20 to 90 feet distant from the explosion. On the bank of the river, and about 700 feet below and east of a point upon the river directly south of the place of the blasting, was a landing place for a ferry; and between these two points, and about 350 feet from the landing, was a mill. The country was sparsely populated, and there was but one house, aside from the mill, within 700 feet of the place of the fatal blast. The contractors had been using heavy charges of powder, and had thrown rocks in every direction, some of them 700 feet from the place of the explosion, but

naturally many more had fallen nearer to the place of the blasting than at a greater distance. Between the place of the explosion and the river much foliage had been stripped from the trees, and their limbs had been broken by falling rocks. The custom of the defendants had been and was to send their employés out 12 or 15 minutes before a charge of powder was to be fired, shouting the word "Fire" at short intervals, for the purpose of warning all persons in the vicinity of the coming explosion, so that they might retire out of danger. Morrison was a laborer, a farmer, and a minister, who earned annually about $100 by the first, about $300 by the second, and about $75 by the third occupation. He had been an employé of the defendants at the place of the explosion within two weeks before the accident occurred, had seen heavy charges of powder exploded, was aware of their effect, and knew how the warning of a coming blast was given, and all the facts which have been recited. The customary method of operating the ferry-boat at this time was to tow it up the stream, so that the current would not carry it below the opposite landing, and then to pole it across the river. But the defendants' witnesses testified that they were not aware that the ferryboat ever came up along the bank in that way. At a time when the defendants had a charge of powder nearly ready for explosion, about 2 or 3 o'clock in the afternoon of October 5, 1902, Morrison came from the north to the landing place of the boat for the purpose of cross-ing the river upon it. When the boat was ready to cross the river, it was loaded with a team of mules, a wagon, and one Davis, the owner of the mules. Thereupon the ferryman walked up along the north bank of the river, and dragged the boat after him by means of a rope attached to it, while Morrison walked along the bank behind him, and pushed the prow of the boat away from the bank with a pole. When they had arrived at a point above the mill, but below a point opposite the place of the blasting, Davis heard the cry of fire, the ferry-man shouted "Don't shoot," and they proceeded on their way up the river. After a short interval Davis again heard the shout "Fire," and the ferryman again cried "Don't shoot," while they continued on their way. And after another interval Davis heard the cry of fire again, the ferryman again cried "Don't shoot," Davis heard the words "All right," the explosion occurred "right then," and a rock from the blast fell upon Morrison and killed him. The defendants' witnesses testified that they did not hear the cry "Don't shoot," did not know that Mor-rison and his companions were near their place of work, and that the words "All right" were addressed to the operator of the battery, and constituted the signal for the explosion. The course of proceeding of the defendants and their employés up to this time had been this: About 12 or 15 minutes before the explosion, men had been sent out, crying "Fire," and they continued to repeat the cry at short intervals until the explosion occurred. One of the employés of the defendants stepped on some logs about 100 feet from the river, faced it, and shouted "Fire." After he had done this he walked 500 feet to the bat-tery before the explosion. Seven witnesses testified that they heard the cry of fire 12 or 15 minutes before the explosion. Three witnesses only, and they were on the opposite side of the river, testified that they first heard the cry from 2 to 5 minutes before the explosion. The

witness Hines testified that he was sitting on the north bank of the river, opposite the mill, when he first heard the warning; that this was 12 or 15 minutes before the explosion; that the ferryboat was then no more than 200 feet above him (and that would have been about 150 feet below a point opposite the place of the blasting); that he heard the cry of fire five times, and that after he first heard it he went north and east 1,000 feet, in order to get out of danger before the explosion occurred. Yandell, another witness, who was on the opposite side of the river, and who did not hear the cry until from 2 to 5 minutes of the explosion, walked 120 feet away from the river after he heard it, and before the explosion, in order to place himself without the range of danger. And Prendergast, who was also on the other side of the river, testified that he heard the cry 15 minutes before the explosion, and went under a shed for shelter. Davis was the only one of the men who were with the boat at the time of the accident who appeared at the trial, and he testified that when he first heard the cry of fire the boat was a little below a point opposite the place of explosion, and that the ferryman dragged it up the river two boat lengths, or 90 feet, and commenced to roll up his lines to start to cross the river before the blast came.

In this state of the evidence the court below instructed the jury, in effect, that there was no question of contributory negligence for their consideration, and that, if the defendants were guilty of negligence, the plaintiff was entitled to their verdict. It refused to charge, at the request of the defendants, that if Morrison was a passenger on the ferryboat, but was walking along the bank of the river, pushing the boat from the bank, and if he heard the warning, and made no effort to get out of danger, but continued to walk along the bank, he was guilty of contributory negligence. It also refused the request of the defendants to instruct the jury that it was the duty of Morrision, when he was made aware of the fact that a blast was about to be fired, to use reasonable diligence to get out of danger. It charged them that it was not the duty of Morrison to abandon the boat in the event that he was crossing the river and was a passenger when the warning was given. These rulings present the question to be considered in this case.

The railroad company and its contractors, the defendants, had the right to grade its road along its right of way. The right to accomplish a result includes the right to use the appropriate means to produce it. In a sparsely settled country, blasting by means of gunpowder or dynamite is a reasonable and justifiable way of removing ledges and rocks for the purpose of bringing a railroad to a proper grade, and a corporation and its contractors have the right to use this method, provided they exercise reasonable care to protect others from injury. Dodge v. County Commissioners of Essex, 3 Metc. (Mass.) 380, 383; Whitehouse v. Androscoggin R. Co., 52 Me. 208; Brown v. Providence, etc., R. Co., 5 Gray, 35, 40; Blackwell v. Lynchburg, etc., R. Co., 111 N. C. 151, 153, 154, 16 S. E. 12, 17 L. R. A. 729, 32 Am. St. Rep. 786; Watts v. Norfolk & W. R. Co., 39 W. Va. 196, 205, 19 S. E. 521, 23 L. R. A. 674, 45 Am. St. Rep. 894; Gates v. Latta, 117 N. C. 189, 190, 23 S. E. 173, 53 Am. St. Rep. 584; Mitchell v. Prange, 110 Mich. 78, 67 N. W. 1096, 34 L. R. A. 182, 64 Am. St. Rep. 329.

While a railroad company has the right to blast rock from its right

of way by means of gunpowder or dynamite, it has no right, without warning, to throw rocks upon persons who are lawfully occupying or using neighboring property, and such an act is a trespass.    Sullivan v. Dunham, 161 N. Y. 290, 55 N. E. 923, 47 L. R. A. 715, 76 Am. St. Rep. 274; Hay v. Cohoes Co., 2 N. Y. 159, 51 Am. Dec. 279; Wright v. Compton, 53 Ind. 337; St. Peter v. Denison, 58 N. Y. 416, 423, 17 Am. Rep. 258; Colton v. Onderdonk, 69 Cal. 155, 159, 10 Pac. 395, 58 Am. Rep. 556.

It is, however, the duty of one who is lawfully using neighboring property, and who is warned of a coming explosion by another, who is rightfully engaged in blasting, to use reasonable diligence to escape from danger from the approaching explosion; and a failure to exercise such care, which concurs in producing his injury, waives the right of action for the trespass, constitutes contributory negligence, and is fatal to an action for the recovery of damages on account of the injury. Sullivan v. Dunham, 10 App. Div. 438, 440, 41 N. Y. Supp. 1083; Wright v. Compton, 53 Ind. 340, 341; Graetz v. McKenzie (Wash.) 35 Pac. 377, 378; Mills v. Wilmington City Ry. Co. (Del. Super.) 40 Atl. 1115; 2 Shearman & Redfield on Law of Negligence, § 688a.

In the case at bar, therefore, the defendants had the right to remove the ledges and rocks from the right of way of the railroad company by explosions of gunpowder or dynamite.    The decedent, Morrison, had the right to walk along the bank of the river for the purpose of accompanying the boat to its starting point, and crossing upon it to the opposite side.    It was the duty of the defendants to warn Morrison and every other person within the circle of danger of the coming explosion they were about to cause.    It was the duty of Morrison and of every one thus warned to exercise reasonable diligence to escape from the danger from the explosion and from the threatened injury, and if they failed to exercise this diligence, and their failure contributed to their injury, it was fatal to an action for damages on account of it.    The evidence is conclusive that Morrison was warned of the danger, and the conclusion is inevitable that the court below fell into an error when it refused to instruct the jury that it was his duty, after he was thus warned, to exercise reasonable diligence to escape from the threatened injury, unless the necessary deduction from the undisputed evidence was such that all reasonable men, in the exercise of an impartial judgment, would be compelled to conclude that he exercised reasonable care or diligence to escape from the impending danger.    The question of contributory negligence, like every question of negligence, is ordinarily for the jury; and it is only when there is no substantial conflict in the evidence which conditions it, and when, from the undisputed facts, all reasonable men, in the exercise of a fair judgment, would be compelled to reach the same conclusion, that the court may lawfully withdraw it from them.    St. Louis, I. M. & S. R. Co. v. Leftwich, 54 C. C. A. 1, 2, 117 Fed. 127, 128; Railroad Co. v. Jarvi, 3 C. C. A. 433, 53 Fed. 65; Pyle v. Clark, 25 C. C. A. 190, 192, 79 Fed. 744, 746; Railroad Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679, 36 L. Ed. 485; Railroad Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213.

In the case at bar neither of these conditions existed.    The evidence which conditions the question of contributory negligence is not free

from substantial conflict, and, if the view of it most favorable to the defendants is taken, as it must be in this case, where the instruction which took the question from the jury was for the plaintiff, reasonable men might well conclude that the decedent was not free from negligence which contributed to his injury. The crucial fact in the case is the time when Morrison first heard the cry of fire. That time is not fixed by the testimony of any witness, but it must be found from the evidence of the witnesses who heard the cries. No one testifies when Morrison first heard them. The great preponderance of the testimony is that the shouts of fire were made at short intervals for a period of from 12 to 15 minutes before the explosion. Seven witnesses heard them at least 12 minutes before the blast was fired. One of these witnesses was about 200 feet below Morrison, on the same bank of the river, and another was on the opposite side of the river, 2,200 feet from the place of the explosion. Three witnesses who were on the other side of the river testified that they first heard ,the cry of fire, and the ferryman's answer, "Don't shoot," from 2 to 5 minutes before the explosion. The natural and rational inference from all this testimony is that the shouts of fire were given for at least 12 minutes before the blast, but that the three witnesses on the other side of the river did not hear the earlier shouts. Did Morrison first hear the warnings when the seven witnesses, many of them farther from the place of blasting than he was, first heard them, or when the three witnesses on the other side of the river first perceived them? The evidence is certainly ample to sustain a finding that Morrison first heard them when the majority of the witnesses first perceived them, 12 or 15 minutes before the explosion. The preponderance of the evidence points to that conclusion. If he heard this warning 12 or 15 minutes before the explosion, all reasonable men would not be compelled, in the exercise of a sound judgment, to conclude that remaining within the circle of danger, or advancing into greater danger, when he was on the bank of the river and free to escape from all danger, was the exercise of reasonable care or diligence.

Again, there is sufficient evidence in this record to warrant a finding by the jury that the ferryboat was at least 150 feet below a point opposite the place where the explosion occurred when the ferryman first cried "Don't shoot." Three witnesses testify that this cry was first heard by them from 2 to 5 minutes before the explosion. Davis says that the ferryman was walking fast, drawing the boat up the river, and then rolling up his lines to start across the river, during this time. A man walking slowly—walking only 3 miles an hour—travels 528 feet in 2 minutes; and the boat sank only 800 feet above the landing, and not more than 100 feet above a point opposite the place of blasting. Davis testifies that the boat was a little below a point opposite the place of the explosion when he first heard the cry of fire. Hines says that it was at least 150 feet below that point when he first heard the cry, and that he was within 200 feet of it. Davis says that the boat went about 90 feet after he first heard the warning, and the testimony of two witnesses on the other side of the river is that the boat seemed to be about opposite the place of the blasting when they first heard the cry "Don't shoot." But Davis' estimates of distance were demonstrated by the measurements to be erroneous. He thought the dis-

tance from the place of the explosion to the point where the boat sank was 450 feet. It was 198 feet. He said he heard the first cry of fire about 900 feet above the landing. But the distance from the landing to the place where the boat sank was only 800 feet. Thus it appears that the evidence was substantial and sufficient to sustain a finding that the boat was 150 feet below the place of blasting when the ferryman first cried "Don't shoot," and when Morrison must have been aware of the danger.

Moreover, wherever the boat may have been, there were at least 2 minutes—time enough for one to go on a slow walk 528 feet, and on a brisk walk 700 feet, after the ferryman first cried "Don't shoot," and before the explosion occurred. It was only about 700 feet from the point on the river opposite the place of blasting to the landing. Every step down the river, away from the place of explosion, diminished the danger of injury. Every step towards it increased the danger. Would a person of ordinary prudence and diligence under such circumstances remain in the imminent danger or advance into increasing danger? Or would he flee from the point of greatest danger, when every step down the river would diminish the chance of his injury? Some reasonable men might well conclude that a person of ordinary prudence and diligence would, under such circumstances, move away, instead of advancing toward or remaining near the point of greatest danger. That was the course pursued by every person within hearing of the warning, except the men about the ferryboat. Five of those who thus retired upon hearing the warning were much farther away from the place of the explosion than Morrison was, and four of them were on the opposite side of the river. Hines, on the same bank, 200 feet below Morrison, traveled 1,000 feet north and east after he heard the cry, and before the explosion occurred. Prendergast, 2,200 feet away, on the other side, took shelter under a shed. Yandell, Pointer, and Travers, on the opposite side of the river, and at least a quarter of a mile distant, turned and walked farther away. The ferryman had the care of his boat. Davis had the care of his mules. Morrison had the care of nothing but himself. He was walking on the bank of the stream, with no responsibility, care, or duty, save the duty to heed the warning and use ordinary care to retire from the impending danger. This was not a case where the facts which conditioned the question of contributory negligence were stipulated, or where they were established by undisputed testimony. It was not a case where, from the facts which the evidence tended to establish, no reasonable men could have rightfully drawn the conclusion that Morrison failed to exercise ordinary care and diligence to escape from the impending danger after he received the warning of it, and the question of his contributory negligence should have been submitted to the jury. It was a debatable question—one upon which the minds of reasonable men might honestly reach opposite conclusions—and hence one peculiarly appropriate for the determination of a jury of men of the vicinage, who are necessarily familiar with the methods of life and action in the country where the accident occurred, and of the course of action which men of ordinary sagacity usually pursue when they are notified that a heavy charge of powder to blast out

rock, which has been falling from such blasts all about the place they are occupying, is about to be exploded. The facts were not so clearly established, nor the inference from them so conclusive, that the court below should have instructed the jury either that if Morrison was a passenger, and was walking along the bank, pushing the boat away from the land with a pole, when he heard the warning, and made no effort to escape, but continued to walk up the river until the explosion, he was guilty of contributory negligence, or that it was not his duty to abandon the boat in the event that he was crossing the river and was a passenger when the warning was given. The court gave the latter instruction. It was erroneous, because the evidence was undisputed that Morrison was not crossing the river when he heard the warning, but was walking on its bank, and because, when he heard the warning, he owed no duty to the boat, nor to the men about him, which was not subordinate to his positive duty to immediately use reasonable diligence to decrease, and if possible to entirely avoid, the impending danger.

There are other specifications of error, but the discussion of those which have been already considered sufficiently indicates the law applicable to the case, and determines the disposition which must be made of it in this court.

The judgment below is accordingly reversed, and the case is remanded to the Circuit Court, with instructions to grant a new trial.

THAYER, Circuit Judge (dissenting). The defendants below, who are the plaintiffs in error in this court, requested the trial court to give four instructions on the subject of contributory negligence, all of which were refused, and the sole question before this court is whether a reversible error was committed in refusing these instructions, or any of them. The first of the four instructions was as follows:

"The evidence shows that at the time of hearing the warning, and until he was killed, Morrison was not in the boat, but was walking on the bank; that he was a passenger, and under no obligation to look out for the safety of the boat or its contents; and you are instructed that when he heard the alarm it was his duty to proceed down the bank in search for a place of safety, and that, if he did not do so, he was guilty of contributory negligence which precludes of recovery in this case."

The second and third instructions embodied the same idea, namely, that if Morrison heard the alarm of fire while walking along the bank and poling the ferryboat offshore, and made no effort to get out of danger after he heard the alarm, he was guilty of contributory negligence.

The fourth instruction was a mere abstract proposition of law, to the following effect:

"The court, in this connection, instructs you that it was the duty of the decedent, Morrison, when he was made aware of the fact that a blast was to be fired, to use reasonable diligence to get out of danger."

I have not been able to conclude that the refusal of either of these instructions constitutes a reversible error. The first three of these instructions were palpably wrong and misleading, in that they ignored material facts which the testimony for the plaintiff below strongly tend-

ed to establish. This testimony was to the effect that no warning of the blast which was about to be fired was given until the ferryboat had started on its voyage across the river, and had proceeded upstream from 150 to 300 yards above the landing; that, when the alarm of fire was given, the captain of the ferryboat immediately hallooed back as loud as he could, two or three times, not to fire until the boat got away, or "Don't shoot until we get away," and that the reply immediately came back from some person in the vicinity of the blast, "All right." In other words, the testimony for the plaintiff below showed that the persons on the ferryboat and alongside of it, including the deceased, were led to believe, by the reply "All right," which was made to the captain's exclamation "Don't shoot," that the firing of the blast would be deferred until the boat had got out of danger. Obviously, then, if such was the fact, and the jury had so found, as they might well have done, under the testimony, it could not be said that the deceased was guilty of contributory negligence, as these instructions declared, because he did not drop his pole and search for a place of safety immediately after the alarm of fire was given. The first three instructions that were asked on the subject of contributory negligence wholly ignored this phase of the testimony, and the trial court properly refused these requests for that reason.

The fourth instruction, above quoted, stated merely an abstract proposition of law, giving the jury no precise direction as to what the deceased's conduct should have been on the occasion in question. If the deceased heard the alarm of fire, and also heard the captain's exclamation "Don't shoot," and the response "All right," and understood from such response, as he probably did, that the blast would not be fired until the boat was out of danger, no one can say that he did not exercise reasonable diligence in acting as he did. On the other hand, if he did not hear such response, and was not given to understand that the blast would not be fired, the exercise of reasonable diligence might, in the estimation of the jury, have required him to act differently than he did. The fault with this instruction, in my judgment, was that it was too general in its terms, not adapted to the different phases of the testimony, and was not calculated to give the jury any information concerning their duty in the premises. Instructions ought always to be adapted to the various hypotheses of fact which may be found by a jury, and a judgment ought not to be reversed because the trial court fails to give an instruction, as respects some abstract rule of law, however accurate it may be, which is not calculated to aid the jury in reaching a correct conclusion. There is abundant evidence in the record to support the conclusion that the plaintiffs in error were guilty of negligence. Indeed, I do not understand that fact to be challenged by the majority opinion. The testimony shows that the blasts which they were in the habit of firing from this cut were very heavy. When fired they showered the surrounding country with rock, and put the lives of every one who was within the vicinity in peril. It was shown that only a day or two previous to the accident in question a blast had been fired which threw a rock weighing 20 tons entirely across the river. Under these circumstances, it was the duty of the defendants below to have taken greater care than they appear to

have taken to ascertain, before firing a blast, whether all persons within the danger line had been duly notified of the expected explosion, and were in a place of safety, or had been given time to reach a place of safety. Certainly such blasts as the one in question ought not to be fired in proximity to a ferry landing, and near a public highway, without taking such precautions as are fully adequate to protect human life. In the present instance the area of danger was so large that if the decedent, when he first heard the warning cry, "Fire," had dropped his pole and run in any direction, he might not have reached a place where he would have been any safer than by remaining where he was; but, conceding it to be true that it was his duty to have made some effort to reach a place of safety after he heard the warning cry of fire, yet the plaintiffs' evidence, if credited by the jury, was of such a character as excused him from making any such effort. I think that no instruction on the subject of contributory negligence, such as was requested, ought to have been given, and that the record discloses no reversible error.